**UNITED STATES of America**

**v.**

**7 CARTONS, MORE OR LESS * * * Labeled in part * * * "FERRO–LAC SWINE FORMULA CONCENTRATE (MEDICATED)".**

No. P-2853.

United States District Court
S. D. Illinois, N. D.
Dec. 16, 1968.

Richard E. Eagleton, U. S. Atty., Peoria, Ill., for libelant.

O. J. Taylor, Neale, Newman, Bradshaw, Freeman & Neale, Springfield, Mo., Richard E. Quinn, Cassidy, Cassidy, Quinn & Lindholm, Peoria, Ill., for claimant.

## MEMORANDUM DECISION ON MOTION FOR PARTIAL SUMMARY JUDGMENT

ROBERT D. MORGAN, District Judge.

This is a civil action in rem arising under the provisions of the Federal Food, Drug and Cosmetic Act. 21 U.S. C. § 301 ff.

This cause is now before the court upon the motion of the United States for partial summary judgment.

On or about March 22, 1966, claimant, Naremco, Inc., shipped 7 Cartons, each containing 12 bags, of a product labeled "Ferro-Lac Swine Formula Concentrate (Medicated)" in interstate commerce from Springfield, Missouri, to Atkinson, Illinois. This libel is directed against those 7 Cartons of Ferro-Lac.

The libel alleges that there were three violations of the Act in the shipment of the product in interstate commerce.

First, it alleges that Ferro-Lac is a new drug, within the meaning of 21 U.S.C. § 321(p), which was unlawfully introduced into interstate commerce without an approved "new-drug" application in effect with respect to the product in violation of 21 U.S.C. § 355(a).

Second, it alleges that Ferro-Lac is a food within the meaning of 21 U.S.C. § 321(f), and that the article is adulterated as a food within the meaning of 21 U.S.C. § 342(a) (2) (C), in that it contains a combination of food additives which are unsafe within the meaning of 21 U.S.C. § 348, because the use and intended use of the combination of additives are not in conformity with any regulation or exemption promulgated pursuant to 21 U.S.C. § 348.

Third, it alleges that the commodity is misbranded as a drug within the meaning of 21 U.S.C. § 352(a).

The government's motion for partial summary judgment is directed to the "new drug" and adulterated food issues.

The active ingredients of the product, labeled and sold by claimant for use as an additive to food for swine for the prevention and treatment of infectious non-specific diarrhea and bacterial interitis, are sodium propionate, sodium phthalylsulfacetamide and methylrosaniline chloride.

The parties have stipulated that the product is a drug within the meaning of 21 U.S.C. § 321(g) and that no new drug application is in effect with respect thereto. They further stipulate that the

product is a food within the meaning of 21 U.S.C. § 321(f).

The test whether a drug is a "new drug" within the meaning of the statute is whether its composition is such that it "is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety of drugs, as safe for use" as prescribed by the labeling. 21 U.S.C. § 321(p). A like test of general recognition by qualified experts applies to the question whether any given product is an unsafe food additive. 21 U.S.C. §§ 321(s), 342(a) (2) (C), 348.

In addition to the pleadings and the answers of the parties to interrogatories, there are before the court on this motion for summary judgment affidavits submitted by the government in support of the motion, and by the claimant in opposition thereto.

To a degree, there is some conflict between the affidavits submitted by the government and those submitted by the claimant.

■ The government contends that any conflict between the affidavits of experts related to the question of general recognition proves the want of general recognition of the statutory factors. Three district court cases are cited by the government which do tend to lend support to that theory. Merritt Corp. v. Folsom, D.D.C., 165 F.Supp. 418, 421 (1958); United States v. 354 Bulk Cartons, etc., D.N.J., 178 F.Supp. 847, 853 (1959); United States v. Article of Drug, etc., N.D.Ga.1968, 294 F.Supp. 1307.

Actually only two of those cases arose in the summary judgment context, and neither contains any well-reasoned basis for the conclusion that a conflict of relevant expert opinion is proof of a want of general recognition as a matter of law. In the *Merritt* case, that principle is stated as a conclusion of law, without any opinion or analysis. In *354 Bulk Cartons*, the court cited *Merritt*, without analytic discussion, to support its statement of the principle.

In the *204 Boxes* case, decided this year, the court quoted the statement of principle from those earlier cases in stating its conclusion that the principle was clearly established. It also appears very questionable that this case can have any relevance upon the issue here involved. The opinion indicates that the decision followed a bench trial, and that the court was evaluating the diametrically opposed testimony of expert witnesses after subjection to cross-examination. In that context, the existence of conflict in expert opinion might well prove the fact of the lack of general recognition of the safety and effectiveness of a drug. It seems to this court quite something else to conclude, as a matter of law, that conflict between affidavits upon a motion for summary judgment disposes of that issue of fact.

A Court of Appeals has recently disavowed expression as to the validity of the principle in AMP, Inc. v. Gardner, 2 Cir., 389 F.2d 825, 831 (1968), saying:

"While we would not necessarily accept the defendants' position that whenever a court in a case such as this one is presented with a genuine difference of opinion among experts as to a drug's safety and effectiveness, that case is ripe for summary judgment, we agree that on the affidavits presented here there remained no genuine issue of material fact to be tried."

So stating, that court then characterized the affidavits presented by *AMP* as being limited to the statement of personal or professional opinions of the respective affiants, and not addressed to the fact of general recognition or lack thereof.

This court is convinced that the government's contention cannot be accepted as a sound principle of procedural law for application to this statute. The statute provides a test of general recognition. The rule stated in *Merritt* and subsequent cases would equate the statutory language, "generally recognized," to "unanimously recognized." There is no justification for such equation. There is nothing in the statute to indicate that

Congress intended "generally recognized" in other than its commonly understood meaning. The adverb, "generally," is defined, inter alia, to mean, "In general; extensively, though not universally; most frequently, but not without exception; * * *" Webster's New Twentieth Century Dictionary, Unabridged, 2nd Ed.

The statute relates to drugs. The question of the safety and effectiveness of a drug encompasses the realms of physiology, biology, pathology, pharmacology, toxicology, organic chemistry, among other sciences. It could be expected that genuinely honest differences in expert opinion on the safety and effectiveness might exist with reference to most drug compounds.

█ When such genuine differences of expert opinion addressed to the relevant factual question are expressed in opposed affidavits, the case is not a proper case for summary judgment. That conflict of opinion seems to present a genuine issue of fact for trial.

The government argues that the rule stated in *Merritt* and subsequent cases is compelled by the statute's purpose of protection of the public health. This court does not agree. The statutory purpose is served by an orderly judicial procedure. It cannot justify the decision of factual issues by summary judgment.

Where, as here, each party has submitted affidavits in support of its position, the court must examine those affidavits to determine whether a genuine difference of expert opinion is presented. If such difference of opinion appears, decision must abide the results of a trial of the issues. If, on the other hand, no genuine difference of expert opinion as to the fact of general recognition is shown to exist, summary judgment is proper.

On the new drug issue, the government has submitted the affidavit of Harold E. Amstutz, D. V. M., a Professor of Veterinary Medicine and the Head of the Department of Veterinary Science and Medicine at Purdue University.

Doctor Amstutz specializes in the clinical study of the nature, causes and treatment of diseases in horses, cattle and swine, and acts as a consultant for the swine industry in his specialty.

It is his opinion that Ferro-Lac is not now, and has never been, generally recognized among qualified and informed clinical veterinarians as safe and effective for the treatment or prevention of bacterial enteritis and infectious, non-specific diarrhea in swine.

That opinion was formulated upon the basis of the following facts stated in his affidavit: that he keeps himself currently informed of developments in his specialty by studying the veterinary medical literature, attending professional meetings, and consultation with his colleagues in the field of clinical veterinary medicine; that, in his specialty, he would normally have knowledge of any product which was recognized as effective in the prevention and treatment of bacterial enteritis and infectious non-specific diarrhea in swine; that he has never heard of any compound of a similar composition to Ferro-Lac for the prevention or treatment of any disease in swine; that he knows of no instance when any of his colleagues in the field of clinical veterinary medicine has mentioned Ferro-Lac, and no occasion when either he or his colleagues have ever attributed treatment or prevention of bacterial enteritis and infectious non-specific diarrhea in swine to Ferro-Lac or any other drug of similar composition; and that he has found no reference in the veterinary medical literature to any such drug compound.

Opposed to the affidavit of Dr. Amstutz, claimant has submitted the affidavit of James R. Bedell, claimant's director of research. He states that he has conducted research upon and studied the several active ingredients in Ferro-Lac; that methylrosaniline chloride has been long used and recognized as a bactericidal and bacteriostatic drug in human medicine; that sodium phthalysulfacetamide is a recognized antibacterical agent particularly suitable for treatment of infec-

tions in the intestinal tract; that sodium propionate is recognized as a bacteriostatic, fungistatic and fungicidal chemical for the treatment of bacterial infections in animals; that he has personal knowledge of the effective use of Ferro-Lac in the treatment of bacterial enteritis in thousands of swine; and that he has knowledge of the use of the product by a number of doctors of veterinary medicine for the treatment of enteritis in swine.

Upon the basis of those facts, Mr. Bedell states the opinion that Ferro-Lac is generally recognized, in the statutorily-defined expert opinion, as being safe and effective for the purpose for which it is recommended and sold.

It seems clear to this court that the Bedell affidavit, though it culminates in the requisite statutory conclusion, can be construed only as a statement of the opinion of the affiant. There is no indication of a specialty, or of educational or clinical training of the affiant, which would show him to be qualified by scientific training and experience to evaluate the safety and effectiveness of drugs for use in animals, or, more important, to have knowledge of the work or conclusions of other experts. It is noteworthy that affiant mentions "Doctors of Veterinary Medicine," not otherwise identified, to whom he attributes such scientific training and experience by conclusory statement. Though the "study of scientific literature" is recited as one basis of support for affiant's ultimate conclusion, the affidavit contains no reference to any scientific writing related to an evaluation of Ferro-Lac or any other similar compound.

The affidavit identifies certain labels from various commercial drugs which are marketed with Food and Drug Administration approval. Each label indicates that the product contains one of the chemical components of Ferro-Lac. In some cases such component is in a compound form with other chemical agents. A casual reading of the table of ingredients on the labels reveals that none of those products contains the combination of ingredients of Ferro-Lac.

This court concludes that there remains no genuine issue as to any material fact upon the "new drug" issue. The affidavit of Dr. Amstutz states, factually, that there is not general recognition of Ferro-Lac, or any similar compound, as safe and effective for the purpose for which the drug is sold and recommended. Given its broadest construction in favor of claimant, the factual content of the opposed affidavit is limited to a statement of personal opinion, which is translated by unsupported conclusion of the affiant to show the requisite general recognition. In such case, no factual issue is shown to exist. AMP, Inc. v. Gardner, 2 Cir., 389 F.2d 825, 831.

In support of its motion upon the adulterated food issue, the government has submitted the affidavits of W. G. Huber, D. V. M., Assistant Dean and Professor of Physiology and Pharmacology of the College of Veterinary Medicine, University of Illinois, and Kenneth P. DuBois, Professor of Pharmacology and Director of the Toxicity Laboratory at the School of Medicine of the University of Chicago.

Dr. Huber is a specialist in the field of veterinary pharmacology. The focus of research in that specialty, as it relates to animals which serve as food for human consumption, is directed both to the therapeutic effectiveness of drug compounds for the treatment of such animals and the evaluation of the safety of such drug in terms of its toxicity to the animal and its potential hazard to human life from chemical residues in the consumable animal tissues.

Dr. Huber states that he first heard of Ferro-Lac in September, 1967, when he was informed as to its existence, its ingredients and its claimed purpose by the Food and Drug Administration; that the individual active ingredients of Ferro-Lac may be safely used in proper circumstances in human and veterinary medicine; that he had never heard of the combination of the three ingredients for

the recommended purpose or any other; that it cannot be inferred from the fact that the individual ingredients of Ferro-Lac can be safely used; that their use in combination is safe for the purpose recommended by claimant; that he has found no information in medical literature or other sources related to the toxicity, physiological action and effect or the therapeutic value of Ferro-Lac, or any other similar compound; that there is no way, except by actual testing, to determine whether the compound is safe when used as claimant directs; and that scientific study of the product is necessary to demonstrate that long term ingestion of potential residues of the chemical in edible tissues will not be harmful to humans.

He states the opinion, based upon experience and his educational background, that Ferro-Lac is not generally recognized among experts in the field of veterinary pharmacology to be safe for humans who may ingest the edible tissues of animals exposed to the product, or to be safe and effective for the purpose for which it is recommended and sold by claimant.

Dr. DuBois specializes in the field of human and animal toxicology. He states in his affidavit that he first heard of Ferro-Lac when it was called to his attention in September, 1967, by the Food and Drug Administration; that he has knowledge of the individual pharmacological and toxicological effects of each of the active chemical components of Ferro-Lac; that he had never, prior to 1967, heard of the combination of the three chemicals for any purpose whatsoever; that the individual characteristics of those chemicals, separately, may have no value in the evaluation of the toxicological effects of the combination of all three of them with regard to the safety of either the animal or humans who ingest edible tissues of animals exposed to that combination; that the safety to human beings of the compound can be scientifically determined only by an evaluation of residues of the substance, or abnormalities, in the edible tissues of

swine to which the substance had been fed; and that he had found no reference to, or information related to, any tests of the compound for any purpose whatsoever in the pharmacological-toxicological literature or other sources in his professional environment.

Dr. DuBois concluded that Ferro-Lac has not been generally recognized among qualified and informed toxicologists as having been shown through scientific procedures to be safe for the recommended purpose.

Claimant submitted the affidavit of Emil Lorz, an organic chemist and biochemist, and the director of research for a commercial firm engaged in the development and manufacture of drugs and chemicals.

Mr. Lorz states that he is familiar with the chemical properties and structure of the three chemicals here involved, and with the formula and label of Ferro-Lac; that, assuming that Ferro-Lac is used as directed in the feeding of swine, and that the digestive tract of swine is acid, not alkaline, it is "a reasonable scientific certainty" that the three chemicals in combination would be no more toxic or unsafe to swine, or to humans ingesting the edible portions of that swine, than would any of the ingredients, individually, if the same were administered to swine "in the same amount"; that that opinion is based upon principles of chemistry; and that any chemist would "necessarily recognize" the result stated.

He concluded that the stated facts "constitute general recognition" that the combination of active ingredients of Ferro-Lac "is as safe and effective as the ingredients individually."

Clearly, the Lorz affidavit is not addressed to the statutory standard.

"The term 'food additive' means any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food * *, if such substance is not generally recog-

nized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures * * * to be safe under the conditions of its intended use." 21 U.S.C. § 321(s).

The statute further provides that a food "shall be deemed adulterated" if it is, or contains, any food additive which is unsafe within the meaning of Section 348 of Title 21. 21 U.S.C. § 342(a) (2) (C). Section 348 provides that any food additive shall be deemed to be unsafe unless its intended use conforms to an exemption in effect with respect thereto, or the additive and its intended use conform to a regulation issued under the section prescribing the conditions under which such additive may be safely used. 21 U.S.C. § 348(a) (1) & (2).

No exemption or regulation prescribing the conditions of use exists with reference to Ferro-Lac.

The affidavits submitted by the government substantiate the fact that there is lack of general recognition of Ferro-Lac as having been demonstrated "through scientific procedures" to be safe under the conditions of its intended use.

It is clear that the opinion stated by Mr. Lorz is based upon a theoretical evaluation of the chemical properties of each of the active ingredients of Ferro-Lac and their reaction in combination when placed in combination in an assumed environment. The affidavit contains, at best, an inference that safety might be shown by scientific testing and procedures. It is not addressed to the critical test of general recognition in the scientific community that the compound has been shown through scientific procedures to be safe.

■ No genuine issue as to any material fact is presented with reference to the government's claim that Ferro-Lac is an adulterated food within the meaning of the statute.

There remaining as to the new drug and food additive charges no genuine issue as to any material fact, the government is entitled to the summary judgment of condemnation of the articles seized as sought by its motion. The Court concludes that Ferro-Lac is a new drug, and that it is adulterated in that it contains an unsafe food additive.

This memorandum contains the Court's findings of fact and conclusions of law. The motion for partial summary judgment is allowed.

The government shall promptly submit a proposed form of judgment order in conformity with the views herein expressed.