UNITED STATES of America

v.

1,048,000 CAPSULES, MORE OR LESS, in Drums Labeled in Part: (Drum) RX # 1722 #2 Red Capsules Control No. 12869 Each Capsule Contains: Methyltestosterone Five Milligrams; Yohimbine HCL. 5 Milligrams, Ext. Nux Vomica 5 Milligrams . . . . ."

Civ. A. No. 66–H–781.

United States District Court,
S. D. Texas,
Houston Division.

Aug. 17, 1972.

Anthony J. P. Farris, U. S. Atty., Olney Wallis, Asst. U. S. Atty., Houston, Tex., for plaintiff.

Sol E. Abrams, and George F. Townes, Abrams, Bowen & Townes, Greenville, S. C., and Jerome R. Epstein, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

This is a seizure action brought under § 304 of the Federal Food, Drug & Cosmetic Act, 21 U.S.C. § 334, to condemn approximately 33,000 capsules of the drug Afrodex. The libel of information, filed on November 14, 1966, alleges that the capsules were misbranded when introduced into, while in, and while held for sale after shipment in interstate commerce. Section 304 of the Act authorizes the seizure and condemnation of any misbranded drug when introduced into or while held for sale after shipment in interstate commerce.

Pursuant to Monition, the capsules were seized along with a large quantity of promotional literature which is alleged to be labeling for the drug. Subsequently, Bentex Pharmaceutical Company, Houston, Texas, intervened and filed its claim and answer. Claimant admits that the seized article is a drug which was shipped in interstate commerce, but denies that it is misbranded, and alleges affirmatively that the product is not a new drug and that the product falls under the Grandfather Clause to the new drug definition, 21 U.S.C. § 321(p). Thus, the primary issue before the Court is whether Afrodex is a new drug as contended by the libellant, or whether it is an old drug or a grandfathered drug, as contended by the claimant.

Under the Act, a new drug is defined as a drug the composition of which "is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p). The "effectiveness" requirement was added to the provision of § 321(p) by the 1962 amendment to the drug laws.

The Grandfather Clause under the 1962 drug amendment, § 107(c)(4) of Public Law 87–781, 21 U.S.C.A. note following § 321, exempts from this requirement of "effectiveness" any drug (1) which was commercially used or sold in the United States on the day immediate-

ly preceding October 10, 1962, the effective date of the "Grandfather Clause" exemption, (2) which was not a new drug as defined by 21 U.S.C. § 321(p) as then in force; (3) which was not then covered by an effective new drug application under 21 U.S.C. § 355, and (4) which currently is intended solely for use under conditions exactly the same as those prescribed, recommended or suggested in the labeling with respect to such drug on October 9, 1962. In short, only if Afrodex was marketed on October 9, 1962, for exactly the same uses for which it is presently being sold and was then generally recognized by qualified experts as safe for those uses, is it exempt under this Grandfather Clause from the test of general recognition by experts as being both safe and effective for its claimed uses. Tyler Pharmacal Distributors, Inc. v. United States Department of Health, Education & Welfare, 408 F.2d 95, 99 (7th Cir. 1969). If Afrodex is now regarded among qualified experts as safe and effective for the uses intended, it is an old drug. If either old or grandfathered and if not misbranded, Afrodex may be lawfully sold without the filing of a new drug application and without complying with regulatory requirements of 21 U.S. C. § 355.

## I.

## THE GRANDFATHER CLAUSE

■■ It has been stipulated that Afrodex was commercially used and sold in the United States on October 9, 1962, and previously, and was not covered by an effective new drug application. Accordingly, these requisites are not issues in this case. Therefore, in order to claim the exemptions of the Grandfather Clause, claimant must show that, on October 9, 1962, Afrodex was generally recognized among qualified experts as safe, and must further show that the labeling and the claims made in the labeling of Afrodex are exactly the same as

on October 9, 1962. The burden of proof is on the claimant, inasmuch as the clause is construed strictly against one invoking its protection, United States v. Allan Drug Corp., 357 F.2d 713, 718 (10th Cir. 1966), cert. denied, 385 U.S. 899, 87 S.Ct. 203, 17 L.Ed.2d 131 (1966).

■ Libellant contends that the rule for determining general recognition for safety is a strict rule, first pronounced in the *Merritt* case:

> Where there is a *genuine difference of medical opinion* among the experts on the question of whether a drug is generally recognized as safe for the treatment of a particular disease, it must be concluded that the drug is not generally recognized as safe for use in the treatment of that disease. (emphasis added)

United States v. An Article of Drug, Etc., 294 F.Supp. 1307, 1311 (N.D.Ga. 1968), aff'd, 415 F.2d 390 (5th Cir. 1969), quoting Merritt Corp. v. Folsom, 165 F.Supp. 418, 421 (D.D.C.1958); *accord*, United States v. 354 Bulk Cartons, Etc., 178 F.Supp. 847, 853 (D.N.J.1959). The claimant argues that the *Merritt* rule is erroneous inasmuch as it equates the statutory language "generally recognized" with "unanimously recognized". It is further contended that later, well-considered cases hold that "there is no justification for such equation," United States v. 7 Cartons, More or Less, Etc., 293 F.Supp. 660, 662 (S.D.Ill.1968), modified on other grounds, 424 F.2d 1364 (7th Cir. 1970). *Accord*, AMP, Inc. v. Gardner, 389 F.2d 825, 831 (2d Cir. 1968); Lemmon Pharmacal Co. v. Richardson, 319 F.Supp. 375, 378 (E.D. Pa.1970). This Court is of the opinion that the term "general recognition" must be given its common meaning; i. e., extensive recognition rather than universal acceptance. *See* United States of America v. An Article of Drug . . . "Bentex Ulcerine", C.A.No. 70–H–880 and C.A.No. 71–H–31 (Consolidated)

(S.D.Tex. April 20, 1972), opinion by Judge Ben C. Connally, at 8.[1]

■ Again, in relation to the criteria for general recognition among experts, a second dispute has arisen. Libellant urges that the clinical impressions of general practitioners cannot be relied upon to establish general recognition among experts of the safety or efficacy of drugs. In support of this principle, the Court is cited to the testimony of Dr. Louis Goodman, Professor of Pharmacology at the University of Utah College of Medicine, and co-author of a medical treatise on pharmacology, at hearings before the sub-committee on antitrust and monopoly, Senate Judiciary Committee, 86 Cong., 2d Sess. at 217 (1961). Dr. Goodman stated that "the average practicing physician . . . just does not have the time, the facilities, the skill, nor the training to be an expert in the determination of drug efficacy." This view is, in a somewhat different context, substantiated in United States v. 7 Cartons, More or Less, Etc., 293 F.Supp. 660, 664 (S.D.Ill.1968). There, the Court refused to consider an affidavit executed by the Director of Research of the claimant's pharmaceutical company. The Court reasoned:

> There is no indication of a specialty, or of educational or clinical training of the affiant, which would show him to be qualified by scientific training and experience to evaluate the safety and effectiveness of drugs for use in animals, or, more important, to have knowledge of the work or conclusions of other experts.

293 F.Supp. at 664. This Court is certainly not inclined to adopt as a rule without exception the policy of rejecting all clinical impressions by all general practitioners, even though a realistic approach in instances in which sophisticated medical areas are involved would find most testimony of this nature to be less than compelling, and most general practitioners understandably underexposed to the latest technical advances in a given field of expertise. It is not inconceivable, however, that a practicing physician in a particular case could accomplish a thorough and well-controlled technical investigation, including appropriate clinical studies, which would be highly informative in evaluating the safety or efficacy of a certain drug. See Upjohn Co. v. Finch, 422 F.2d 944, 951 (6th Cir. 1970).

■ Upon application of these guidelines and propositions of law, however, the Court cannot find that claimant in this case has met its burden of proof. Rather, the Court finds that the drug Afrodex was not generally recognized among qualified experts as of October 9, 1962, to be safe for use under the conditions prescribed, recommended or suggested in the labeling as of that date. A review of the relevant and controlling expert testimony will not be made at this point, inasmuch as a detailed recapitulation is contained in part II of this opinion, infra.

It is sufficient to note here that experts in various fields of involvement—pharmacology, endocrinology, psychiatry, and urology—testified that Afrodex was not generally recognized as safe on October 9, 1962. No adequate and well-controlled investigation of the drug had been accomplished, and there was an absence of literature establishing safety, both of which factors are relevant in proving that a product is not generally recognized, United States v. 41 Cases, More or Less, 420 F.2d 1126, 1130 (5th Cir. 1970); United States v. An Article

---

1. The Court notes a recent affirmance by the Court of Appeals for the Fifth Circuit of an opinion in which the *Merritt* rule was applied, United States v. An Article of Drug, Etc., 415 F.2d 390 (5th Cir. 1969), aff'g 294 F.Supp. 1307 (N.D. Ga.1968). However, the appellate court seemed to recognize a standard more in accord with that utilized in Judge Connally's *Ulcerine* decision, for it was found on appeal that "[t]he district court simply credited the Government's witnesses rather than Norwich's witnesses." 415 F.2d at 392. Accordingly, this Court does not feel compelled to accept the *Merritt* rule.

of Drug, Etc., 294 F.Supp. 1307, 1311 (N.D.Ga.1968), aff'd, 415 F.2d 390 (5th Cir. 1969). *See also* United States v. An Article of Drugs . . . "Bentex Ulcerine", C.A.No. 70–H–880 and C.A. No. 71–H–31 (Consolidated) (S.D.Tex., April 20, 1972), opinion by Judge Ben C. Connally, at 11–12.

■ This finding alone removes Afrodex from consideration under the Grandfather Clause. For this reason, the Court will not consider whether the labeling and the claims made in the labeling of Afrodex are exactly the same as on October 9, 1962, although it is clear that plaintiff's exhibits D through F, and H through M, (consisting of reprints of professional medical studies of Afrodex published by doctors in medical journals, and of "Dear Doctor" letters printed by the claimant company) which were distributed *to* physicians in promoting the sale of Afrodex, are entirely proper for consideration in this regard. *See* Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948); United States v. Urbuteit, 335 U.S. 355, 69 S.Ct. 112, 93 L.Ed. 61 (1948); United States v. Diapulse Mfg. Corp., 389 F. 2d 612, 615–616 (2d Cir. 1968).

## II.

## NEW DRUG STATUS

■ The remaining issue, then, is whether or not Afrodex is a new drug within the meaning of 21 U.S.C. § 321 (p). In this instance, the Government as libellant has the burden of proof by a preponderance of the evidence. United States v. Articles of Drug Labeled "Quick-O-Ver", 274 F.Supp. 443 (D.Md. 1967). This inquiry necessarily obligates the Court to examine and consider the pharmaceutical composition and medical use of Afrodex.

Afrodex contains three active ingredients: methyltestosterone, yohimbine and extract of nux vomica, each in the amount of 5 milligrams. Methyltestosterone is a synthetic form of the male hormone testosterone, which is a part of the group of male hormones called androgens. Yohimbine is an alkaloid used to stimulate the para-sympathetic nervous system in animals and allegedly capable of such use in man. Extract of nux vomica is an alkaloid preparation of strychnine which relaxes inhibitions and allows nervous stimulation.

According to the package insert and file card accompanying the drug, Afrodex is indicated for use in the treatment of hypogonadal impotence and/or male climacteric, and neurasthenia. Hypogonadal impotence is impotence caused by insufficient functioning of the testes to secrete testosterone, that is, impotence caused by androgen deficiency. Male climacteric is a somewhat outdated, decidedly controversial term used variously to describe (1) an organically caused condition in the male analogous to menopause in the female brought about by a sudden drop of androgen production, or (2) a condition systemic or psychogenic in origin characterized by hot flashes, irritability and impotence. In this sense, the term male climacteric does not indicate a decrease in androgen production. Neurasthenia, as used in the labeling of Afrodex, is an archaic, obsolete term used to describe a general condition of weakness or nervous fatigue. Testimony reflects that neurasthenia refers to symptoms rather than to specific diseases or malfunctions. The condition of neurasthenia is viewed as psychogenic in origin.[2]

These *definitions are of necessity* over-simplified; they are included to establish this Court's Finding, on the basis of an evaluation of all of the expert testimony, that the indicated use of Afrodex is not limited to impotence caused by androgenic deficiency.[3]

---

2. Dr. Schoolar testified that, although the use of the term neurasthenia as defined here is obsolete, the term has a valid use in the speciality of psychiatry.

3. Claimant emphatically denies that the labeling of the drug Afrodex extends to impotence from any origin, even though the expert witnesses testifying on behalf

■  A major portion of the expert testimony heard in this suit centered around the safety and efficacy of the component methyltestosterone. Expert testimony was also taken concerning yohimbine and extract of nux vomica, as well as the combination of these ingredients in the amounts contained in the drug Afrodex. It should be noted that the safety and efficacy of combination drugs such as Afrodex cannot be equated with the safety of the components separately or in combination with different ingredients, United States v. Seven Cartons, More or Less, etc., 293 F. Supp. 660, 664 (S.D.Ill.1968). Thus, the fact that any one individual component of a combination drug may be generally recognized as safe and effective is not relevant to the issue asserted, that is, whether the combination itself is so recognized.

At the risk of prolonging this opinion unduly, it is felt necessary to do more than summarily allude to the conclusions of the many able expert witnesses who testified at length in this case. It is a substantive area in which the layman including this Court can readily lose his way in a morass of technical terms which, once comprehended, serve to bridge and lead to an understanding of the professed uses of Afrodex in the pharmacological, medical and psychiatric fields. Whatever the extent of this litigation, this articulation of expert opinion should assist in graphically underscoring the reasons why this Court is persuaded to hold as it does today.

The Government's first witness was Dr. Arthur Grollman, Professor of Experimental Medicine at the University of Texas Southwestern Medical School. A pharmacologist, endocrinologist and author of a medical text on pharmacology and numerous scientific publications, Dr. Grollman testified that the primary cause of impotence was psychogenic in origin; that a specific diagnosis of the cause of impotence is a necessary condition precedent to proper treatment; that the only type of impotence for which methyltestosterone has any recognized use is the treatment of impotence caused by androgen deficiency. He enumerated certain side effects of methyltestosterone, including the retention of sodium and water which may cause edema, acceleration of latent cancer of the prostate, and liver damage resulting in jaundice. He found methyltestosterone to be contraindicated in persons having congestive heart failure for which edema could be fatal, known or suspected cancer of the prostate or any preexisting liver disease. In examining the labeling of Afrodex, he found no contraindication listed for liver disease or heart failure, nor a listing of these complications as possible side effects. Dr. Grollman indicated that there was no generally accepted therapeutic use for yohimbine and nux vomica for treatment of impotence. He had neither seen nor been referred to

of the claimant found Afrodex to be indicated for such use. Claimant goes to great lengths to show the proper construction of the language on plantiff's exh. A–C (admitted to be labeling), and the "manufacturer's meaning"

is that Afrodex is useful for treatment of impotence arising from a waning of the sexual system, as in the male climacteric or in neurasthenic impotence, and to that arising from testosterone deficiency of the type known as hypogonadal impotence.

*See* claimant's Post-Trial Brief at 21–23. The Court finds, on the basis of the overwhelming expert testimony in this regard, that the plain meaning of the labeling (even assuming, *arguendo*, that labeling is restricted to plaintiff's exh. A–C)

indicates use of the drug Afrodex for impotence of any origin. The Court also notes with interest an admission by the claimant:

As to the term neurasthenia, the witnesses agree that it is a vague term, susceptible of many meanings. They also agree that it is an old term, not in current use as a diagnostic term, although it has only recently been redefined as a term in psychiatry.

Because a restriction of claims as to a grandfathered drug may result in loss of grandfathered status, the claimant has no choice but to continue to use an old fashioned *"wastebasket" word.* (emphasis added)

Claimant's Post-Trial Brief at 21.

any valid evidence of adequate scientific experiments which would establish the safety or efficacy of Afrodex; he found the published articles on Afrodex to be entirely lacking, inasmuch as they reported invalid studies without a critical evaluation by either author or publisher. He testified that Afrodex had not been and was not presently recognized by experts to be either safe or effective for the uses indicated in the labeling.

Also testifying on behalf of the libellant was Dr. Joseph C. Schoolar, Associate Professor of Pharmacology and Associate Professor of Psychiatry at Baylor College of Medicine in Houston. Dr. Schoolar is active in teaching, research and the private practice of psychiatry. He testified that a high percentage of all male impotence was emotional or psychogenic in origin; that although methyltestosterone would be used for impotence caused by an androgen deficiency, it was not effective in treating impotence of a psychogenic or emotional basis. He testified that yohimbine and nux vomica were not generally recognized for the treatment of impotence of any origin. In fact, he found that the anxiety-producing effect of the ingredient yohimbine would only complicate the problems of treating impotence of a psychogenic origin. He, as did Dr. Grollman, stressed the necessity for focusing on the basic underlying problems after diagnosis, rather than the treatment of "impotence". In other words, he stressed the treatment of the underlying pathology rather than the symptom. It was his opinion that, other than the placebo effect of Afrodex, it was of no benefit in the treatment of psychogenic impotence and neurasthenia, both of which he found to be indicated on the labeling of the drug. He found that the published material relating to Afrodex did not report adequate and well controlled studies upon which an expert could conclude that Afrodex is either safe or effective for use in any condition.

Next was the testimony of Dr. Emil Steinberger, Professor and Director of a program in Reproductive Biology at the University of Texas Medical School. Dr. Steinberger specializes in endocrinology, particularly reproductive biology in the male, and has authored over 100 scientific publications dealing primarily with male reproduction. He testified that he does not believe in the empirical treatment of impotence; he found it essential to ascertain the cause of impotence prior to determining the appropriate treatment. He testified that impotence may stem from physical, neurological, psychogenic and androgen deficiency origins; that only if impotence is caused by androgen deficiency is the proper course of treatment one calling for replacement therapy with androgens; that if impotence is psychogenic in origin the proper course of treatment would be counseling and advice, and, if necessary, referral to a psychiatrist. Drs. Grollman, Schoolar and Steinberger all testified that methyltestosterone was no longer the preferred androgen for replacement therapy, because other androgens had been found to be more effective and less likely to cause adverse side effects. Dr. Steinberger was of the opinion that yohimbine had some use as an hallucinogen, but he was not aware of any evidence of use of yohimbine or nux vomica for the treatment of impotence or neurasthenia.

Dr. Steinberger provided the Court with a detailed explanation of the testing procedures necessary for determining the safety and efficacy of a combination drug such as Afrodex. He reviewed a 10,000 case study compiled under the auspices of the claimant, noting its deficiencies and its invalidity in determing safety and effectiveness. He also reviewed the published materials relating to Afrodex, detailing the inadequacy of the studies. He explained that, even if the studies had been properly and adequately designed and performed, they could not reveal any information as to the individual ingredients of Afrodex or the proper dosage of such components; that is, the optimum dosage with the minimum toxicity. His expert opinion was that Afrodex was not generally

recognized as safe and effective for the treatment of impotence of any origin.

The final witness for the libellant was Dr. Russell Scott, Jr., Professor of Urology and Head of the Division of Urology in the Department of Surgery at Baylor College of Medicine. Dr. Scott was in basic agreement with the testimony of the three previous witnesses for the libellant; his most significant testimony concerned his in-depth study to determine the frequency of cancer of the prostate in men. His autopsy studies revealed that 41 percent of men over the age of 70 and 57 percent of men over the age of 80 were found to have cancer of the prostate; that in four out of five cases of prostate cancer, the condition went undetected and unsuspected even after rectal examination and the obtaining of a medical history; that in all such cases methyltestosterone would be a dangerous drug to administer because of its stimulating effect upon cancer of the prostate.

Dr. Scott testified that in his expert opinion the ingredient methyltestosterone was an effective treatment for hypogonadal impotence; that he knew of no use in the treatment of impotence for yohimbine and nux vomica; and that methyltestosterone would be a safe treatment for impotence caused by androgen deficiency only if there were no pre-existing prostate cancer, heart trouble, or liver malfunction. He testified that Afrodex was not generally recognized as safe or effective for the treatment of impotence.

The claimant's presentation of expert testimony countering that of the Government commenced with Dr. John Eibert, a toxicological chemist. Dr. Eibert was formerly a consultant for Bentex Pharmaceutical Co., during which time he conducted toxicological studies on the drug Afrodex. He testified that, on the basis of his tests, the three individual components of Afrodex and the combination were safe. He testified that the ingredients had no effect in combination which was different from the effect of each ingredient separately. Dr. Eibert performed acute toxicity studies with Afrodex on rats and dogs, but performed no chronic toxicity tests to determine the long term effect of Afrodex. However, he testified that on the basis of his expert knowledge and his review of published material, he was able to form conclusions as to the chronic toxicity of Afrodex as well. He testified that Afrodex was generally recognized among qualified experts to be safe, and was so recognized prior to 1962.

Dr. William Miller, a board certified urologist from Pensacola, Florida, testified on behalf of the claimant. He treated the condition of impotence empirically, was of the opinion that diagnosis was not necessary to treatment and believed that Afrodex was suitable for the treatment of impotence of any origin. He testified that, at the dosage level indicated for Afrodex, there would be no problem of edema or liver damage. His expert opinion was that Afrodex is safe and effective and is generally so recognized.

Also testifying for the claimant was Dr. D. W. Holloway, a general practitioner in Houston, Texas. Dr. Holloway testified that he employes Afrodex for use in treatment of impotence of any origin and for use in treatment of neurasthenia without accompanying impotence. His testimony reflected that the indications for use of Afrodex contained in the labeling provided for such use of the drug. His opinion was that Afrodex was generally recognized as safe and effective; however, he presumed a pre-clearance as to safety and efficacy prior to any drug being placed on the market.[4] Dr. Holloway employed empirical treatment for all cases of impotence, and he treated psychogenic impotence through use of hypnosis and the drug Afrodex. He did not know whether Afrodex was generally recognized by pharmacologists, endocrinologists or psychiatrists, although his opinion was that urologists

---

4. *See also* deposition testimony of Dr. Seth W. Poole at 51–52.

generally believed Afrodex to be safe and effective.

The testimony of Dr. E. E. Mazique, a specialist in internal medicine, was also heard in support of the claimant. Dr. Mazique testified that in his opinion Afrodex was generally recognized among physicians as safe and effective; further, he believed Afrodex to be safe and effective based upon his own clinical impressions of the drug. He testified, as did Drs. Miller and Holloway, that Afrodex would be indicated for use even for treatment of impotence unrelated to androgen deficiency.

█ In addition to the above witnesses, there was deposition testimony of other physicians. This testimony will not be reiterated here, since it is primarily cumulative. The Court has weighed all of the evidence presented in this case in accordance with the legal principles stated, *supra,* in part I of this opinion. It is this Court's opinion that the great weight of the evidence is clearly in libellant's favor. It is also apparent that, in view of the potential hazards to the public which come to light from a careful assessment of the evidence, it is an appropriate case for the statutory safeguards to come into play. Accordingly, this Court finds that the drug Afrodex is a new drug within the meaning of 21 U.S.C. § 321(p); i. e., Afrodex is found to be a drug not generally recognized among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof.[5]

The Court having found that Afrodex is a new drug within the meaning of the statute and that it is not protected by the Grandfather Clause, it is properly subject to seizure and condemnation. This opinion constitutes the Findings of Fact and Conclusions of Law of this Court. Counsel for the libellant will submit a proposed Order consistent herewith, approved as to form, within thirty (30) days from the date of entry. It is so ordered.

---

5. It is stipulated that if Afrodex is a new drug within the meaning of 21 U.S.C. § 321(p), it is misbranded within the meaning of 21 U.S.C. § 352(f) (1).