UNITED STATES of America, Plaintiff,

v.

An article of drug consisting of the following: 15,866/50-tablet bottles, more or less, and 512/500-tablet bottles, more or less, labeled in part: (bottle) Tutag Pharmaceuticals, Broomfield, Colorado * * * X–Otag Plus Tablets Each tablet contains: Orphenadrine citrate 50 mg., Acetaminophen 325 mg. Caution: Federal law prohibits dispensing without prescription * * * X–OTAG PLUS TABLETS * * * 76/2 Tutag Pharmaceuticals, Inc., Broomfield, Colorado 80020 and undetermined quantities of the aforesaid article labeled as aforesaid, Defendant.

UNITED STATES of America, Plaintiff,

v.

TUTAG PHARMACEUTICALS, INC., a corporation, and Stanley J. Tutag, an Individual, Defendants.

Civ. A. Nos. 77–F–248 and 77–F–719.

United States District Court,
D. Colorado.

Nov. 7, 1977.

Joseph F. Dolan, U.S. Atty. by Lena A. Wilson, Asst. U.S. Atty., Denver, Colo., Donald O. Beers, Asst. Chief Counsel, Food and Drug Administration, Rockville, Md., for plaintiff.

Cassandra G. Sasso, Jeffrey Weinman, Dawson, Nagel, Sherman & Howard, Denver, Colo., William R. Pendergast, Wayne H. Matelski, McMurray & Pendergast, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

SHERMAN G. FINESILVER, District Judge.

The United States has brought two actions premised on violation of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* [FDCA]. In action 77–F–248, the United States seeks the condemnation of the article of drug, X–Otag Plus, seized by the Government, and claimed by Tutag Pharmaceuticals, a drug manufacturer located in Broomfield, Colorado. In action 77–F–719, the Government requests the entry of an injunction, pursuant to 21 U.S.C. § 332, against Tutag preventing the further shipment of X–Otag Plus in interstate commerce. In support of both actions, the United States claims X–Otag Plus is a "new drug" within the meaning of 21 U.S.C. § 321(p)(1) which cannot be introduced into interstate commerce without an approved new drug application [NDA] or abbreviated new drug application [ANDA][1] on file with the Federal Food and Drug Administration [FDA] as required by 21 U.S.C. § 355. Further, X–Otag Plus is alleged to be "misbranded" within the meaning of 21 U.S.C. § 352(f)(1).

X–Otag Plus is a combination drug, its active ingredients being 50 mg. orphenadrine citrate and 325 mg. acetaminophen. It is a prescription drug whose intended use is

1. An ANDA may be filed, rather than a NDA, when the FDA finds such an application to be sufficient for the drug in question. 21 C.F.R. § 314.1(a). When the FDA approves the use of an ANDA, the manufacturer must comply with the provisions of 21 C.F.R. § 314.1(f), which basically relieve the manufacturer from having to supply studies showing the safety and effectiveness of the drug at issue. The use of an ANDA for X–Otag Plus was never approved by the FDA in this case.

as a pain-killer to relieve mild and moderate musculo-skeletal disorders.

Claimants/defendants, Tutag Pharmaceuticals and its president, Stanley Tutag, admit the shipment of X–Otag Plus in interstate commerce. They deny X–Otag Plus is a "new drug" for which an NDA or ANDA is required or that it is "misbranded." No statutorily prescribed exemption from regulation is alleged. Even if X–Otag Plus is a "new drug," Tutag asserts the Government is estopped or barred from bringing these actions. Also, it is claimed the Government has not presented an administrative record sufficient to justify its conclusion X–Otag Plus is a "new drug," and such a record should be produced for this Court's review. Therefore, the case should be remanded to the FDA so a record may be made.

The cases were consolidated for the purposes of trial. The jurisdiction of this Court under 21 U.S.C. §§ 331, 332(a) is admitted.

After a review of the statute, regulations, case law, briefs, and the evidence presented by the parties, we find: (1) The production of an administrative record supporting the FDA's contention X–Otag Plus is a "new drug" and is "misbranded" is not a requisite for this Court to determine the matters before it in these enforcement and injunction proceedings; (2) the United States has shown, by a preponderance of the evidence, X–Otag Plus is a "new drug" within the meaning of 21 U.S.C. § 321(p)(1) for the purposes of these actions; (3) the Government is not estopped or barred from bringing these actions; (4) the seized drugs should be condemned and destroyed; (5) an injunction should enter enjoining Tutag Pharmaceuticals from further shipment of X–Otag Plus in interstate commerce.

## I.

■ We have considered and reject Tutag's contention that the FDA must provide the District Court with an administrative record supporting its assertion X–Otag Plus is a "new drug" and is "misbranded." In its argument, Tutag relies almost exclusively on the Tenth Circuit opinion, *Rutherford v. United States*, 542 F.2d 1137 (1976). After full consideration of Tutag's claim, we find *Rutherford* to be distinguishable from the situation presented here.

In *Rutherford*, the plaintiffs, a class of cancer patients, sought an injunction against the FDA from precluding the administration of laetrile to patients in the United States. No new drug application had ever been filed with the FDA, and the plaintiffs were without means or resources to, themselves, seek approval of such an application pursuant to 21 U.S.C. § 355.[2] Thus, although there had never been a formal determination that laetrile was or was not a new drug, the FDA refused to allow the shipment or distribution of laetrile on the ground that it was a "new drug." In essence, the Tenth Circuit Court of Appeals found the FDA action constituted a "declaratory order." In reliance on *Weinberger v. Hynson, Wescott & Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), the Circuit Court held that appropriate procedure for the district court was to remand the case to the FDA for the development of an administrative record which the district court could review pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–04.

The issue raised by the claimants/defendants here is whether a decision by the FDA to bring an enforcement action against one particular drug, as distinguished from the

2. Tutag has the "resources" to seek FDA approval of X–Otag Plus pursuant to 21 U.S.C. § 355, and, in fact, has done so. On October 26, 1976, Tutag submitted an ANDA for X–Otag Plus. That ANDA was filed on February 25, 1977 over the protest of the FDA which felt that a NDA, rather than an ANDA was required for X–Otag Plus. In April, the Director of the Bureau of Drugs issued a notice of opportunity for a hearing on his decision that the ANDA could not be approved. 42 F.R. 21847 (April 29, 1977). On June 27, 1977, Tutag filed its request for hearing. The hearing has yet to be held.

On March 29, 1977, Tutag filed a NDA for X–Otag which was rejected by the FDA on August 24, 1977. Prior to having filed either its ANDA or NDA, Tutag shipped X–Otag Plus in interstate commerce.

type of action in *Rutherford*, is a declaratory order within the meaning of the APA, 5 U.S.C. § 554(e). We find that such a decision is not a declaratory order. The FDA determination to bring enforcement and injunction proceedings is, indeed, premised on their contention that X–Otag Plus is a "new drug" and is "misbranded." But to hold that such assertions constitute *de facto* declaratory orders requiring full administrative records for review of the district court, would undermine the entire purpose of the FDCA.[3]

A decision by the FDA to pursue the enforcement and injunctive remedies available under the statute against a particular drug is not premised on a clear administrative finding that the drug in question is a "new drug." Significantly, the FDA decision is based on probable cause to believe that the drug is a "new drug" which should be subject to the requisite approval under 21 U.S.C. § 355 prior to being held for sale in the interstate market. The case of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1966), clearly distinguishes a finding of probable cause for proceeding against a particular drug manufacturer and the promulgation of a "self-operative industry-wide regulation" which is a declaratory order. *Id.* at 147, 87 S.Ct. 1507.

Thus, the only issue before a district court in drug enforcement and injunction actions is whether the FDA has sufficient probable cause to believe the drug in question is a "new drug" or is "misbranded" to be able to successfully maintain the cause of action. In *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), the Supreme Court held that a claimant/defendant has the right to assert the defense of lack of probable cause at the enforcement proceeding; further, that a full hearing should be held. At such hearing, the government must prove by a preponderance of the evidence the drug in question is a "new drug." If it fails to meet this burden, the action must be dismissed. *See United States v. 1,048,000 Capsules*, 347 F.Supp. 768 (S.D.Tex.1972); *United States v. Articles of Drug . . . Quick-O-Ver*, 274 F.Supp. 443 (D.Md.1967).

■ It is not within the jurisdiction of a district court to determine whether the drug in issue is or is not a "new drug." Such a decision is to be made by the FDA, the agency entrusted by Congress with the necessary expertise to make well-informed decisions on this issue. *CIBA Corp. v. Weinberger*, 412 U.S. 640, 644, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 652, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *United States v. Articles of Drug . . . Quick-O-Ver, supra* at 445.[4]

---

**3.** The FDCA is remedial legislation which is to be given liberal construction consistent with its essential purpose to protect the public health and safety. *United States v. Article of Drug . . . Bacto-Undisk*, 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969); *United States v. An Article of Drug . . . Entrol–C Medicated*, 362 F.Supp. 424 (S.D.Cal.1973), *aff'd*, 513 F.2d 1127 (9th Cir. 1975). The objective of enforcement and injunction proceedings is to remove from the market and prevent further marketing of drugs potentially dangerous to the public health and safety. If the FDA were required to compile a full administrative record before it could bring such actions, it would be deterred in its need to expedite the removal of such drugs from the market.

**4.** The second two *Weinberger* cases in the trilogy of related cases suggest in enforcement proceedings, the district court may wish to stay any decision awaiting an administrative decision on the "new drug" issue. *CIBA Corp. v.*

*Weinberger*, 412 U.S. 640, 644, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 652, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973). As to the rationale for staying the enforcement actions, the Supreme Court suggests that the district courts are not competent to determine the "new drug" issue. However, in this action we are only determining whether the United States has shown sufficient probable cause to be able to successfully maintain these actions. Granted, such a finding on our part would involve consideration of evidence relating to the "new drug" issue, but we do not intend to make a dispositive holding on that issue. Should we find that the seized drugs should be condemned and an injunction should enter, Tutag will be left in the position of complying with the dictates of 21 U.S.C. § 355. In this case, that would mean Tutag must pursue the opportunity for hearing which it has requested in an attempt to overturn the prior decision against

**110**

Having defined our role in the actions before us, we proceed to other issues.

## II.

The enforcement and injunction proceedings in this case are based on two grounds: X–Otag Plus is a "new drug" without an approved NDA or ANDA on file, and, X–Otag Plus is "misbranded." The parties have stipulated if X–Otag Plus is found not to be a "new drug" within the meaning of 28 U.S.C. § 321(p)(1), it need not have an approved NDA or ANDA and it is not "misbranded." Therefore, we address the issue of whether X–Otag Plus is a "new drug."

■ The FDCA defines a "new drug" to be:

Any drug . . . the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labelling thereof . . . .

28 U.S.C. § 321(p)(1). In deciding the question whether a certain drug is or is not a "new drug" within the meaning of the statute, courts have traditionally considered two types of evidence. First, courts consider the presence or absence of "adequate and well-controlled" studies, published in scientific literature attesting to the safety and effectiveness of the drug in question. See 21 C.F.R. § 314.111(a)(5)(ii), which delineates the "essentials" for an "adequate and well-controlled clinical investigation." Such clinical studies concern the actual safety and effectiveness of the drug at issue. The fact the studies are published in scientific literature ensures wide distribution of the knowledge contained therein, thereby supporting arguments of "general recognition."

The Supreme Court in *Weinberger v. Hynson, Westcott & Dunning, Inc., supra* at

629, 93 S.Ct. 2469, held the "hurdle" of general recognition of effectiveness requires at least substantial evidence of effectiveness for approval of an NDA pursuant to 21 U.S.C. § 355. The absence of such studies on efficacy of a drug supports a finding that the drug is a "new drug." The following authorities discuss the need for clinical studies appearing in scientific literature: *United States v. An Article of Drug . . . Bentex Ulcerine,* 469 F.2d 875 (5th Cir. 1972); *United States v. An Article of Drug . . . Entrol-C Medicated,* 362 F.Supp. 424 (S.D.Cal.1973), *aff'd,* 513 F.2d 1127 (9th Cir. 1975); *United States v. An Article of Drug . . . Mykocert,* 345 F.Supp. 571 (N.D.Ill.1972).

The second type of evidence courts have considered in determining whether a certain drug is generally recognized as safe and effective is opinion testimony of qualified experts.

■ In the context of recognition of clinical drug studies, the courts have taken several views as to what is meant by the phrase *"generally recognized."* Some courts have tended to equate general recognition with unanimous or universal recognition. *See e. g., United States v. 354 Bulk Cartons,* 178 F.Supp. 847 (D.N.J.1959); *Merritt Corp. v. Folsom,* 165 F.Supp. 418 (D.D.C.1958). Other courts have interpreted "general" by its plain meaning. In *United States v. 7 Cartons,* 293 F.Supp. 660 (S.D.Ill.1968), *aff'd* 7 Cir., 424 F.2d 1364, the district court, quoting Webster's Dictionary, defined "generally" to mean, "In general; extensively, though no universally; most frequently, but not without exception; . . . ." 293 F.Supp. at 662. *See also, United States v. 1,048,000 Capsules,* 347 F.Supp. 768 (S.D.Tex.1972). Of the two interpretations of "generally recognized", we agree with the latter, more commonsense approach.

## III.

■ Where, as here, the drug is a combination drug, additional problems arise in

X–Otag Plus. Once the FDA has made a final ruling, Tutag may seek review in the court of appeals pursuant to 21 U.S.C. § 355(h).

In light of the above, we find that a stay is not mandated.

determining whether or not it is generally recognized. The regulations state that the newness of a drug may arise by reason of:

(2) The newness for a drug use of a combination of two or more substances, none of which is a new drug.

(3) The newness for drug use of the proportion of a substance in combination, even though such combination containing such substance in other proportion is not a new drug.

21 C.F.R. 310.3(h)(2) and (3). These regulations raise two issues as to combination drugs. First, even though the individual components of a combination have been recognized as safe and effective, the combination of the two may create a "new drug." The rationale for special treatment of combination drugs is that a single component of a drug may affect the other components, react with them, and enhance or reduce the total effect of the drug. Also, a combination of two generally recognized drugs may produce unexpected side effects thereby affecting the safety of the combination. *United States v. Xerac Alcohol Acne Gel*, F.D.Cosm.L.Rep. ¶ 42,165 (N.D.Ill.1971). *See also United States v. Articles of Food and Drug*, 518 F.2d 743 (5th Cir. 1975); *United States v. An Article of Drug . . Entrol-C Medicated, supra*, 362 F.Supp. at 427, 513 F.2d at 1129; *United States v. 1,048,000 Capsules, supra* at 773; *United States v. An Article of Drug . . . Mykocert, supra* at 575-76. Several courts have held a manufacturer may attempt to show the combination of generally recognized drugs does not constitute a new drug. To meet the burden presented here, the manufacturer must show that the combination of generally recognized component drugs is not "greater or newer than its parts." *United States v. An Article of Drug . . . Entrol-C Medicated, supra*, 513 F.2d at 1129. *See also United States v. An Article of Drug . . . Mykocert, supra* at 576. Moreover, it must be shown that there is some benefit to the fixed combination in terms of greater effectiveness or safety. 21 C.F.R. § 300.50.

 The second issue relates to a drug containing the same components, but in different amounts as a generally recognized combination drug. The possibility of the existence of a generally recognized combination drug which contains the same components as the drug in question has been discussed in court opinions. These cases have held, unless the drug in question is in the exact form, dosage, and application as the generally recognized drug, tests and opinions as to the safety and effectiveness of the generally recognized drug cannot apply to the drug at issue. In fact, opinion testimony that the component ingredients of a drug are known to be safe and effective in a wide variety of combinations is insufficient to show a particular combination is safe and effective. *United States v. Asper-Sleep*, F.D.Cosm.L.Rep. ¶ 42,153 (N.D.Ill.1971). *See also United States v. An Article of Drug . . . Mykocert, supra* at 575.

Harmonizing the authorities we find: (1) there must exist a combination drug in the exact form, dosage, and application as X–Otag Plus which is generally recognized, or (2) the component parts of X–Otag Plus are generally recognized and the sum of the parts is no greater or newer than the individual parts.

### IV.

We now consider the pivotal testimony at trial. The Government presented three witnesses, Dr. William Barr, Dr. James Miles, and Dr. Alan Nies, all of whom testified, in their opinion, the formulation found in X–Otag Plus was not generally recognized as safe and effective for its intended use.[5]

Tutag Pharmaceuticals' witnesses, Dr. Solomon Snyder, Dr. David Blake, Dr. Per-

---

5. Dr. Barr is a Professor and Chairman of the Department of Pharmacy and Pharmaceutics at the Medical College of Virginia. Dr. Miles is a Professor and the Chairman of the Department of Orthopedics, University of Colorado Medical Center. Dr. Alan Nies is a Professor of Medicine and Pharmacology and the Director of the Division of Clinical Pharmacology at the University of Colorado Medical Center.

ry Molinoff, and Dr. Barry Hoffer, testified in their opinion, X–Otag Plus was generally recognized as safe and effective.[6]

In the context of general recognition among qualified experts, we note that none of the above witnesses with the exception of Dr. Snyder,[7] had heard of the drug X–Otag Plus, or of a combination drug with its precise components, prior to preparation for the trial.

As to the requisite "adequate and well-controlled clinical studies," the Government contends Tutag has not completed any studies designed to show the safety and effectiveness of X–Otag Plus, with the exception of one unpublished bioavailability study. It also asserted that no studies have been conducted by anyone which confirm the safety and effectiveness of the precise combination found in X–Otag Plus. Dr. Barr further testified on the issue of the safety of the combination of X–Otag Plus. In his opinion, a question arises as to whether the combination of orphenadrine citrate and acetaminophen would increase the the possibility of hepatic toxicity (permanent liver damage) which acetaminophen is known to cause in excess doses. He based his opinion on two studies on phenobarbital and its tendency to increase drug metabolizing enzymes in the liver, thereby decreasing the amount of a drug, such as acetaminophen, necessary to cause hepatic toxicity.[8] Orphenadrine citrate is known to act similarly to phenobarbital, although not to the same extreme. Tutag claimed that its bioavailability study showed that the combination in

X–Otag Plus did not metabolize at a rate different than acetaminophen alone. Dr. Barr, however, noted Tutag's bioavailability study involved only single doses, and did not reach the chronic doses which would reflect the potential effect he delineated.

In defense, Tutag presented five studies to support its claim that X–Otag Plus is safe and effective. As these studies are critical to the case, each shall be briefly summarized as to the nature of the study and results obtained.

Tutag's Exhibit E was a study by Tervo and associates entitled "A Controlled Clinical Trial of Muscle Relaxant Analgesic Combination in the Treatment of Acute Lumbago."[9] The study involved fifty patients suffering from acute lumbago. The patients were divided into two groups of twenty-five. One group received intramuscular injections of orphenadrine citrate (60 mg. in 2 ml.) followed by the use of orphenadrine citrate/paracetamol (acetaminophen) tablets (in 35 mg. and 450 mg. amounts, respectively—this combination is known as "European Norgesic"). The other group received intramuscular injections of saline with subsequent use of paracetamol (acetaminophen) tablets (450 mg.). The results showed that the group which received orphenadrine citrate injections and the orphenadrine citrate/paracetamol tablets improved significantly over the other group.

The test conducted by Valtonen, "A Controlled Clinical Trial of Chlormezanone, Orphenadrine/Paracetamol and Placebo in the Treatment of Painful Skeletal Muscle

---

6. Dr. Snyder is a Professor of Pharmacology and Experimental Therapeutics and a Professor of Psychiatry at John Hopkins University School of Medicine. Dr. Blake is an Assistant Professor in the Department of Pharmacology at John Hopkins University School of Medicine. Dr. Molinoff is an Associate Professor in the Department of Pharmacology at University of Colorado Medical Center. Dr. Hoffer is a Professor in the Department of Pharmacology, University of Colorado Medical Center.

7. Dr. Snyder was aware of the drug X–Otag Plus prior to the filing of this law suit. He serves as a consultant for Tutag Pharmaceuti-

cals, and, accordingly had previously advised the company with respect to that drug.

8. See Conney et al., "Adaptive Increases in Drug Metabolizing Enzymes Induced by Phenobarbital and Other Drugs," 130 *J.Pharmacol. Exp.Therap.* 1 (1960); Mitchell, et al., "Acetaminophen-Induced Hepatic Necrosis. Role of Drug Metabolism," 187 *J.Pharmacol.Exp.Therap.* 185 (1973).

9. Tervo, T., Petaja, L., & Lepisto, P., "A Controlled Clinical Trial of a Muscle Relaxant Analgesic Combination in the Treatment of Acute Lumbago," 3 *Brit.J.Clin.Prac.* 62 (1976).

Spasms," [10] studied the effect of the above named drugs on 400 patients with painful muscle spasms. The patients were divided into four test groups of 100 each. Group 1 received placebo; group 2 received chlormezanone (one tablet of 200 mg. three times a day); group 3 received orphenadrine citrate (one tablet of 100 mg. twice a day); group 4 received the fixed combination of orphenadrine citrate, 35 mg., and paracetamol (acetaminophen), 450 mg., one tablet three times a day ("European Norgesic"). Group 3 and 4 showed "distinctly better" improvement than group 1 or 2. As between group 3 and 4, the use of orphenadrine citrate and paracetamol resulted in more improvement than the use of orphenadrine citrate alone (66% vs. 71% improvement, respectively). Valtonen concluded, "There is no doubt that a combination of a muscle relaxant and an analgesic is of value in the symptomatic relief of painful muscular conditions."

"Orphenadrine/Paracetamol in Backache: Double-Blind Controlled Trial" [11] compared the effectiveness of a preparation containing an analgesic and muscle relaxant against a simple analgesic. More precisely the effect of "European Norgesic" (35 mg. orphenadrine citrate and 450 mg. paracetamol) was compared to aspirin (450 mg.). Ninety-nine patients, all of whom complained of acute or acute-on-chronic pain in the lumbar region, were divided into two groups for the investigation. No significant difference was found between the two groups for relief of pain or tenderness. However, the improvement in forward flexion for the group on the combination was statistically greater than for the group on aspirin alone.

Two studies, "An Evaluation of Orphenadrine Citrate in Combination with APC as an Analgesic" [12] and "Drug Combinations with Orphenadrine for Pain Relief Associated with Muscle Spasm," [13] compared the effectiveness of the combination orphenadrine citrate (25 mg.) and APC (aspirin 225 mg., phenacetin 160 mg., and caffeine 30 mg.) with each of its component parts. Both studies concluded that the combination, which is known as "American Norgesic," was more effective than its component parts, the former finding the combination more effective as an analgesic, the latter finding the combination providing greater initial pain relief. These studies are said to be relevant to the combination found in X–Otag Plus as a high percentage of phenacetin metabolizes into acetaminophen in the human system.

All of Tutag's experts testified, on the basis of these published tests, that X–Otag Plus is generally recognized as safe and effective for its intended purposes. Also, it is argued by Tutag that although none of the above tests were "perfect" in the sense of being "well-controlled" as required by the FDA regulations, none of them suffered from such gross imperfection as to render the results invalid.

In summary, the United States' witnesses testified that the studies presented by Tutag did not individually, or taken as a whole, prove that X–Otag Plus is safe and effective. Further, there was much criticism of the way the tests were conducted. The Government's experts concluded that the first three studies discussed were not "well-controlled" within the meaning of the FDA regulations.

V.

■ On sharply divided testimony presented by both parties, we find and conclude that the Government has shown by a

**10.** Valtonen, E., "A Controlled Clinical Trial of Chlormezanone, Orphenadrine/Paracetamol and Placebo in the Treatment of Painful Skeletal Muscle Spasms," 7 *Annals Clin.Res.* 85 (1975).

**11.** Hingorani, K., "Orphenadrine/Paracetamol in Backache: A Double-Blind Controlled Trial," 25 *Brit.J.Clin.Prac.* 227 (May 1971).

**12.** Cass, L. & Frederik, W., "An Evaluation of Orphenadrine Citrate in Combination with APC as an Analgesic", 6 *Curr.Therap.Res.* 400 (1964).

**13.** Birkeland, I. & Clawson, D., "Drug Combinations with Orphenadrine for Pain Relief Associated with Muscle Spasm", 9 *Clin.Pharmacol. & Therap.* 639 (1969).

preponderance of the evidence that X–Otag Plus is a "new drug" for enforcement proceeding purposes. In light of this severe conflict, we may not conclude that X–Otag Plus is *generally* recognized, as it is not recognized "extensively, though not universally" or "most frequently, but not without exception."

Of the tests admitted into evidence, none of them dealt with the precise combination of drugs found in X–Otag Plus. Assuming the tests were "adequate and well-controlled," they may tend to show that "European Norgesic" or "American Norgesic" are generally recognized as safe and effective. However, they simply do not apply to X–Otag Plus. There is no generally recognized combination drug in the exact form, dosage, and application as X–Otag Plus. Further, although acetaminophen has been generally recognized as safe and effective when properly labelled, orphenadrine citrate has been determined to be a "new drug" by the FDA. *See* 39 F.R. 9487 (March 11, 1974). Accordingly, both of the component parts of X–Otag Plus have *not* been generally recognized as safe and effective. Thus, neither of the possible means to prove a combination drug is safe and effective has been met.

Having found that X–Otag Plus is a "new drug," we find it unnecessary to address the issue of whether X–Otag Plus is "misbranded." The former determination is sufficient to sustain the enforcement and injunction actions brought here.

### VI.

Even though X–Otag Plus has been found to be a "new drug" for the purposes of these enforcement and injunction proceedings, Tutag asserts that the United States is barred from bringing these actions. Tutag contends that the FDA unlawfully failed to approve its ANDA and therefore denied Tutag due process of law. The basis of Tutag's argument is their allegation that the FDA arbitrarily and capriciously failed to follow its own regulations and did not consider appropriate expert opinion on the issue of whether X–Otag

Plus was "related" to an already approved drug under ANDA regulations. Because of this refusal of the FDA to follow its regulations, Tutag's ANDA for X–Otag Plus was rejected. The argument concludes if the FDA had followed its regulations, the ANDA would have been approved and these actions would have never been commenced. Accordingly, the Government should now be estopped from proceeding with its enforcement actions. We find Tutag's estoppel theory unpersuasive and reject it. It is not for this Court to review any error made by the FDA in its consideration of ANDAs or NDAs. Such an argument should be presented to the Circuit Court of Appeals after a final agency determination on the status of X–Otag Plus. 21 U.S.C. § 355(h).

### VII.

Having found that X–Otag Plus has been shown to be a "new drug" for the purposes of these actions, and that the United States is not otherwise estopped or barred from bringing these actions, we find an injunction should enter and the seized drugs should be condemned.

The Government has requested an injunction to enter on the following grounds: Tutag Pharmaceuticals be enjoined from introduction or delivery for introduction of X–Otag Plus in interstate commerce; Tutag be enjoined from any further violation of 21 U.S.C. § 355 with respect to *any* drug it manufactures. The United States also seeks an order of this Court that the injunction shall continue in effect until such time as an NDA is approved for X–Otag Plus and recall is made of all X–Otag Plus distributed since March 8, 1977, the date the seizure action was instituted.

Tutag has challenged the authority of this Court to order recall of the amounts of X–Otag Plus distributed since the initiation of the condemnation and seizure action and the propriety of extending the scope of the injunction to any and all drugs manufactured by Tutag. In the latter regard, Tutag claims that this Court may only deal with the matters set forth in the complaints

set forth before it. We find both of the arguments propounded by Tutag to be persuasive.

The case of *United States v. C.E.B. Products*, 380 F.Supp. 664 (N.D.Ill.1974), contains an extensively-researched and thoroughly-analyzed discussion of the jurisdiction of a district court to order recall of drugs already on the market. The court concluded that the FDCA granted a district court no such authority or jurisdiction. As the FDA cites no authority in opposition to Tutag's position, we agree with the conclusion found in *C.E.B. Products*. We further refuse to extend the injunction issued in this case to all drugs manufactured by Tutag Pharmaceuticals as no issue as to any other drug than X–Otag Plus is before us. Accordingly, the injunction will issue solely on the following basis: Tutag is hereby enjoined from any further shipment or distribution of X–Otag Plus in interstate commerce until such time as the FDA approves an NDA or ANDA for that drug.

Finally, pursuant to our Order herein, the amounts of X–Otag Plus already seized by the United States Marshal are to be destroyed. We note that Tutag has raised the possibility that the drugs not be destroyed until the FDA makes a final determination. By our reading of the statute, the language "any article condemned . . . *shall* be disposed of by destruction," 21 U.S.C. § 334(d)(1) [emphasis added], does not encompass staying destruction while awaiting an FDA determination, especially when drugs lose their potency over time. The United States Marshal is therefore to be directed to proceed with the destruction of the drugs seized.

### ORDER

Having found X–Otag Plus is a "new drug" within the meaning of 21 U.S.C. § 321(p)(1), this Court enters the following orders:

Tutag Pharmaceuticals is hereby ENJOINED from further introduction or delivery for introduction of the drug X–Otag Plus in interstate commerce.

The articles of X–Otag Plus seized on March 9, 1977 are hereby ordered to be inventoried and destroyed by the United States Marshal. An appropriate return is to be filed with the Court.

The Order of this Court is in no way a final determination that the drug X–Otag Plus is or is not a "new drug." Such a determination is for the FDA. We simply find that for the purposes of an enforcement and injunction action, and limited to issues inherent herein, the United States has shown by a preponderance of the evidence that X–Otag Plus is a "new drug."

This memorandum opinion and order constitute findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure. To the extent inconsistent, any prior orders of this Court are vacated. This opinion is issued after complete development of evidence at trial and consideration of briefs presented by the parties and extensive research by the Court.

We find in favor of the Plaintiff, the United States of America, and against Defendants/Claimants, Tutag Pharmaceuticals and Stanley Tutag. The Clerk shall enter the appropriate judgment.