UNITED STATES of America, Plaintiff,

v.

WESTERN SERUM COMPANY, INC., Chemalytics, Inc., Iatric Corporation, corporations, and Wallace F. Schmidt, Edward J. Prochaska, William T. Northey, and Rickie M. Adams, individuals, Defendants.

Civ. No. 77–925. Phx. WPC.

United States District Court, D. Arizona.

Oct. 10, 1980.

James P. Loss, Asst. U. S. Atty., Phoenix, Ariz., Richard E. Geyer, Associate Chief Counsel for Veterinary Medicine, Food and Drug Admin., Rockville, Md., for plaintiff.

Steven A. Cohen, of Levenbaum, Cohen & Reed, Phoenix, Ariz., for defendants.

## MEMORANDUM AND ORDER

COPPLE, District Judge.

In this enforcement action instituted by the United States under the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–392 (1976) [the "Act"], the government seeks to enjoin the Western Serum Company and its principal officers from marketing "adulterated" drugs as prohibited by § 301(a) of the Act, 21 U.S.C. § 331(a). Section 302(a), 21 U.S.C. § 332(a), authorizes this Court to issue an injunction to prevent violations of § 301.

The government alleges that the defendants' drugs are adulterated because under

§ 501(a)(2)(B), 21 U.S.C. § 351(a)(2)(B), they have not been manufactured in accordance with Current Good Manufacturing Practice (CGMP). Moreover, eleven of defendants' drugs[1] are alleged to be unapproved new animal drugs. Under § 501(a)(5), 21 U.S.C. § 351(a)(5), a drug is adulterated if it is a new animal drug which is unsafe within the meaning of § 512, 21 U.S.C. § 360b. Under § 512, a new animal drug is deemed to be unsafe unless there is in effect a new drug application approval with respect to the drug's intended use. A new animal drug is defined by § 201(w), 21 U.S.C. § 321(w), to mean any drug intended for use in animals other than man, "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and expertise to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions described, recommended, or suggested in the labeling ..."

The United States has moved for summary judgment on both the CGMP and new animal drug issues.[2] Defendants have moved to dismiss on the basis that this Court lacks subject matter jurisdiction to determine the new animal drug issue.

This Court will address the defendants' motion first. Defendants argue that this Court is without jurisdiction to make the determination of new drug status. Rather, it is contended that this determination must be made in the first instance by the Food and Drug Administration (FDA) after a formal administrative hearing. To support this contention, defendants rely mainly on a trilogy of Supreme Court cases that interpreted the 1962 amendments to the Act. *Weinberger v. Hynson, Wescott and Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *Ciba Corp. v. Weinberger*, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973). Since the determina-

tion of new drug status involves a resolution of scientific and technical issues, these cases held that primary jurisdiction over new drug status determinations rests with the FDA. Defendants then cite numerous cases to the effect that the district court is without jurisdiction to make this kind of a determination.

None of the cases in the 1973 trilogy involved an FDA enforcement action. Rather, the determination of a new drug status was sought in an action brought by the drug manufacturer. To be sure, there is *dicta* in *Bentex* and *Ciba* that, in an enforcement action, the district court might appropriately await administrative determination of this issue. *Bentex*, 412 U.S. at 654, 93 S.Ct. at 2494; *Ciba*, 412 U.S. at 644, 93 S.Ct. at 2498. Nevertheless, these cases neither held that the FDA's jurisdiction was exclusive nor that a district court must decline jurisdiction until such time as a formal administrative determination can be made.

In the context of an enforcement action, three distinct approaches have emerged regarding the extent to which a district court may resolve the new drug issue. In *United States v. Mosinee Research Corp.*, 583 F.2d 930, 931–32 (7th Cir. 1978), the district court was held to have properly exercised jurisdiction in determining new drug status for the purpose of issuing a preliminary injunction. Taking an opposite view, the district court in *United States v. Alcon Laboratories, Inc.*, Civil No. 78–2378 (D.P.R. April 8, 1980), remanded the issue to the FDA so that the agency could hold a formal hearing pursuant to 5 U.S.C. § 554. A third approach is evident in *United States v. X–OTAG Plus Tablets*, 441 F.Supp. 105 (D.Colo.1977), *aff'd*, 602 F.2d 1387 (10th Cir. 1979). In *X–OTAG*, the court limited its determination of the new drug issue to the extent necessary to decide whether an injunction should be issued: whether the FDA had probable cause to believe that the

---

1. Adrenal Cortex Extract, Amp–200, Arsenocyl, B–Covet, Hypodyne, Iron–CAC Compound, Liv–I–Vet Injection, Panacol, Pep–Iron Injection, Therahist, Theravet Plus with Iron.

2. The government has also alleged in its complaint that certain other drugs are misbranded. These allegations are not a subject of plaintiff's motion.

drug in question was a new drug. *Id.* at 109.

■ This Court is of the opinion that the *X–OTAG* approach is the most appropriate under the circumstances. To require the FDA to conduct a full administrative hearing before it could bring an enforcement action would severely hinder the FDA in expediting the removal of drugs potentially dangerous to public health and safety. On the other hand, due to its lack of expertise in scientific and technical matters, the district court should refrain from making a dispositive decision on the new drug issue. Rather, the court should limit its determination to whether the government has met its burden to demonstrate sufficient probable cause to believe the drug in question is a new drug. If the government meets its burden, an injunction will issue and the manufacturer is left in the position of complying with § 505, 21 U.S.C. § 355.[3]

■ Under § 201(w), 21 U.S.C. § 321(w), an animal drug may attain "not new drug" status if the drug is generally recognized by qualified experts as being both safe and effective for its labeled uses. This standard of recognition requires a consensus within the community of experts founded upon "substantial evidence" as defined by § 505(d), 21 U.S.C. § 355(d). *Hynson,* 412 U.S. at 632, 93 S.Ct. at 2484. Thus, general recognition of safety and effectiveness is dependent upon the "expert knowledge and experience of scientists based on controlled clinical experimentation and backed by substantial support in scientific literature." *Bentex,* 412 U.S. at 652, 93 S.Ct. at 2493; *see United States v. An Article of Drug . . . Entrol–C Medicated,* 513 F.2d 1127, 1128–29 (9th Cir. 1975). Though a determination under § 505(d) and § 201(w) requires the same kind of evidentiary showing, the questions to be resolved are distinct. Whereas § 505(d) requires a finding of actual safety and effectiveness, a determination under § 201(w) relates only to whether there exists a general recognition of safety and

effectiveness. *Premo Pharmaceutical Laboratories, Inc. v. United States,* 629 F.2d 795 (2d Cir. 1980) (citing cases).

■ Thus, the inquiry of this Court is limited to ascertaining whether there exists a general recognition among qualified experts as to the safety and effectiveness of the drugs at issue. To prevail, the government must demonstrate only that a genuine dispute exists within the scientific community regarding the safety and effectiveness of the drug for use as labeled. Conversely, the burden of the defendant is to demonstrate that there is a lack of a genuine dispute, even if there exists no universal agreement. *See United States v. X–OTAG,* 441 F.Supp. at 110.

Plaintiff has certainly established a prima facie case. In his affidavit, Dr. Tennant has testified that he is of the opinion that the eleven drugs are not safe and effective for their intended uses and that he is not aware of any scientific literature that evaluates any of the eleven drugs to determine whether they are safe and effective as to their labeled uses.

Since the test is one of general recognition of safety and effectiveness as opposed to actual safety and effectiveness, defendants cannot escape summary judgment merely by questioning the credibility of Dr. Tennant. At issue is not whether Dr. Tennant holds a correct opinion, but whether Dr. Tennant's opinion is that of an extreme minority, as demonstrated either by expert testimony to this effect or by scientific literature evaluating the drugs as safe and effective as to their labeled uses.

Except as for Therahist, defendants' opposition consists simply of an attack upon Dr. Tennant's credibility and a declaration to the effect that defendants intend to defend use in non–equine species, neither of which sufficiently rebuts the government's contention that general recognition does not exist. The fact that Dr. Tennant's objections may be limited to the drugs' labeling

---

**3.** In complying with § 505, the applicant should be permitted to demonstrate that the drug in question is not a new drug within the meaning of § 201(w). In other words, compliance with § 505 should not constitute an admission that the drug is a new drug.

can hardly be said to be minor. An examination of § 201(w) reveals that safety and effectiveness are to be judged in regard to the uses for which the drug is prescribed, recommended, or suggested in the labeling. Thus the labeled uses must be considered the focus for the determination of safety and effectiveness. A declaration that defendants intend to defend use in non–equine species is insufficient to raise a question of material fact as to whether there exists a general recognition of safety and effectiveness for use in such species. Defendants have submitted no scientific literature or affidavits to address this issue.

As for Therahist, Dr. Loomis, defendants' expert, has testified that the drug is generally recognized as safe and effective as an antihistamine. Dr. Loomis' testimony, however, does not address all of Therahist's labeled uses, and is therefore insufficient to raise a question of fact as to the general recognition of safety and effectiveness for its uses as labeled.

■ Defendants' final argument with regard to the new drug issue is that the government has failed to address the issue of whether the eleven drugs fall within the "grandfather" provisions of § 108(b)(3)(B). The "grandfather" clause exempts certain drugs only from the effectiveness provisions of the 1962 amendments to the definition of "new animal drug." Thus, the clause has no effect whatsoever as to whether a particular drug is generally recognized as safe for its labeled uses. Prior to 1962, a drug was not considered a new drug if it was generally recognized as safe. Thus, before the "grandfather" clause is even relevant to determining whether a drug is excluded from the effectiveness provisions, it must first be determined whether that drug is currently recognized as safe. As demonstrated above, the defendants have failed to demonstrate the existence of a material fact as to whether the eleven drugs are generally recognized either as effective or as safe regarding their labeled uses.

In support of its motion for summary judgment on the CGMP issue, the government relies on three sources to support its contention that defendants have not complied with the regulations:

1. FDA inspection reports;
2. Dr. Turco's testimony that, based upon his examination of the inspection reports, he is of the opinion that numerous CGMP violations exist, some of which are critical;
3. admissions by Western Serum employees that the company was not in compliance with certain CGMP regulations.

■ To prevail on a charge of adulteration based upon a failure to conform to CGMP regulations, the government need not establish that any particular drug is actually deficient as a result. *United States v. Bel–Mar Laboratories, Inc.*, 284 F.Supp. 875, 881 (E.D.N.Y.1968). The Act is concerned with the manner in which a drug is produced as well as its composition and content. *United States v. Lit Drug Co.*, 333 F.Supp. 990, 997–98 (D.N.J.1971). Thus, unless the defendants can raise a material question of fact, either by (1) contesting the accuracy of the inspection reports or by (2) demonstrating that the results of the inspection reports do not indicate noncompliance with the CGMP regulations, summary judgment is proper in this case.

First, defendants do not directly contest the accuracy of the inspection reports. In fact, in their opposition to the government's motion for summary judgment, the defendants apparently admit that certain "discrepancies" have occurred in the past. These discrepancies, it is claimed, will be corrected before Western Serum resumes production. Rather, defendants contend that full compliance with the CGMPs is neither possible nor necessary, that Inspector Cordano was unaware as to which version of the CGMPs was applicable, and that Mr. Cordano was less than objective.

■ Whether full compliance with the CGMPs is either possible or necessary is an issue that is not within this Court's competence. Rather, this is a matter properly left to determination by the FDA. There is no

allegation that the FDA has exceeded its authority in requiring full compliance. Whether in 1980 Mr. Cordano is able to recall the particular CGMPs that were applicable when he inspected defendants' plant in 1975 is irrelevant in determining the accuracy of his reports. As admitted by defendants, it is not the inspector who determines whether a manufacturer is in compliance. As to the issue of Mr. Cordano's objectivity, defendants fail to demonstrate how or even if the accuracy of his reports was affected.

Having concluded that the defendants have failed to raise a question as to the accuracy of the reports, this Court will examine defendants' contention that these reports do not indicate violations of the then existent CGMP regulations. In particular, defendants contend that the following did not constitute CGMP violations: (1) use of distilled water rather than water for injection; (2) failure to assay ingredients; (3) failure to establish expiration dating; and (4) failure to complete stability studies.

To be sure, defendants have raised a question of material fact as to Dr. Turco's testimony that non–use of water for injection is an especially critical violation. *See* Affidavit of Dr. Shotwell. Nevertheless, the violation alleged is not a failure to use water for injection *per se*, but a failure to follow the master formula records and product labels. 21 C.F.R. § 211.101(a)(3) (1978); *see id.* § 211.58(e)(2). As for the failure to assay ingredients, Dr. Shotwell testified only with regard to inert ingredients. Assay of active ingredients was required prior to 1979. 21 C.F.R. § 211.42(d); *see id.* § 211.58(e). Expiration dating was certainly a requirement. 21 C.F.R. § 211.-62. Finally, stability studies were required by 21 C.F.R. § 211.60.

■ Although this Court agrees with Dr. Shotwell that compliance with CGMP regulations is an exceedingly complex issue, defendants have failed to raise a question of material fact either as to the accuracy of the inspection reports or to whether these reports indicate CGMP violations. Had defendants presented evidence sufficient to raise a material question of fact on either issue, this Court would be compelled to deny the government's motion for summary judgment.

■ Finally, the fact that the defendants intend to comply with the CGMPs before manufacturing is resumed will not bar this Court from issuing an injunction to that effect. *See United States v. Article of Drug . . . B Cholinos Capsules*, 362 F.2d 923, 928 (3d Cir. 1966) (complete cessation of illegal activities held no bar to injunction in FDA enforcement action); *United States v. Medwick Laboratories, Inc.*, 416 F.Supp. 832, 833 (N.D.Ill.1976) (same rule of law applied in CGMP case).

IT IS HEREBY ORDERED:

1. That plaintiff's motion for summary judgment is granted.

2. That plaintiff, within fifteen (15) days, will prepare an order of injunction consistent with the foregoing and submit it to the Court for approval.