666 F.2d 335
 UNITED STATES of America, Plaintiff-Appellee,
v.
WESTERN SERUM COMPANY, INC., Chemalytics, Inc., Iatric
Corporation, corporations, and Wallace F. Schmidt, Edward J.
Prochaska, William T. Northey, and Rickie M. Adams,
individuals, Defendants-Appellants.
 No. 80-5835.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 14, 1981.
Decided Jan. 4, 1982.
 
 Steven A. Cohen, Phoenix, Ariz., argued, for defendants-appellants; Levenbaum, Cohen & Reed, Phoenix, Ariz., on brief.
 John J. Powers, III, Dept. of Justice, Washington, D. C., argued, for plaintiff-appellee; Frederic Freilicher, Dept. of Justice, Washington, D. C., on brief.
 Appeal from the United States District Court for the District of Arizona.
 Before KENNEDY and ALARCON, Circuit Judges, and BELLONI,* District Judge.
 KENNEDY, Circuit Judge:
 
 
 1
 Appellant Western Serum is a manufacturer of veterinary drugs. The United States instituted an enforcement action under the Federal Food, Drug and Cosmetic Act of 1938, 21 U.S.C. §§ 301-392 (1976) (herein "the Act"), seeking to enjoin Western Serum from distributing eleven of its drug products.
 
 
 2
 On the Government's motion for summary judgment, the requested injunction was granted.[1] Western Serum and its agents were "permanently restrained and enjoined from directly or indirectly introducing" any of the eleven drugs into interstate commerce, until a new drug application for each drug had been cleared by the FDA. The relevant statutes are set out in the margin.[2]
 
 
 3
 Western Serum contends that the injunction granted against it was improper for three reasons. First, it is argued that as a matter of primary jurisdiction the FDA was required to conduct full hearings and conclude that the drugs involved are not "generally recognized as safe and effective" as a precondition to any determination that the products are "new drugs" under the statute and before seeking an injunction under § 332. Second, Western Serum contends that the 1968 grandfather clause, section 108(b)(3) of Pub.L. 90-399, 82 Stat. 342 (1968), found at 21 U.S.C.A. § 360b note (1972), excuses appellant from compliance with the requirements of section 360b. Western Serum makes a third argument, that since the Government did not raise the grandfather clause issue in its summary judgment motion, it was improper for the court to decide it. This third contention can be given short shrift. The district court did not err in giving summary judgment if it ruled correctly on the legal issues presented. To that question we now turn.
 
 I.
 
 4
 On the primary jurisdiction issue, the plain meaning of the statute, 21 U.S.C. § 332, gives federal district courts jurisdiction to enjoin any and all listed violations of the Act. The Supreme Court in Ciba Corp. v. Weinberger, 412 U.S. 640, 644, 93 S.Ct. 2495, 2498, 37 L.Ed.2d 230 (1973), however, stated, in considered dictum:
 
 
 5
 Cases may arise where there has been no formal administrative determination of the "new drug" issue, it being first tendered to a district court. Even then, however, the district court might well stay its hand, awaiting an appropriate administrative determination of the threshold question.
 
 
 6
 See also Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 652-54, 93 S.Ct. 2488, 2493-94, 37 L.Ed.2d 235 (1973). Seizing upon this language, Western Serum claims that because administrative expertise is needed to resolve highly technical questions, and because the issue here is complex factually, the district court should have deferred proceedings on the injunction until the FDA had followed its own procedures to determine that the products in question were "new drugs."
 
 
 7
 The Government responds that the Supreme Court's language in Bentex and Ciba concerned a matter not briefed in those cases, and not properly at issue, and as ill-advised dicta should not be controlling here. The FDA appears to argue that district courts have no discretion to refuse to act pending FDA hearings, even in a particularly complicated and difficult case.
 
 
 8
 We are much aided in our consideration of the primary jurisdiction issue by the First Circuit's recent discussion of the same problem in United States v. Alcon Laboratories, 636 F.2d 876 (1st Cir. 1981). The court there stated:(D)eference to an agency's primary jurisdiction makes little sense in the context of an enforcement proceeding initiated by the agency.... The agency's view of the question is clear and will have to be substantiated for the agency to prevail in court.... The government asserts, and we have found nothing to the contrary, that of the hundreds of enforcement actions brought by the FDA under section 505 (21 U.S.C. § 355 (1976)) since 1938, none save the present (that reversed by the First Circuit) has been remanded to the agency. Returning issues in an enforcement action to the FDA imposes an administrative burden for which the Act makes no provision, and insofar as the procedure delays adjudication of the regulatory status of the drug, may work to the disadvantage not only of the agency and public, but also of the manufacturer. In such circumstances, the power to remand must be used sparingly. Id. at 888-89.
 
 
 9
 In the case before us, Western Serum's products do not present a particularly difficult problem, aside from the legal issue of interpreting the 1968 grandfather clause. 21 U.S.C. § 321(w) defines a "new animal drug," in relevant part, as any drug "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions described, recommended, or suggested in the labeling thereof." It is also settled that a drug is a new drug unless there is a consensus of informed opinion, founded on well-controlled clinical tests, that the drug is both safe and effective. Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 629-32, 93 S.Ct. 2469, 2483-2484, 37 L.Ed.2d 207 (1973); United States v. An Article of Drug ... Entrol-C Medicated, 513 F.2d 1127, 1128-29 (9th Cir. 1975). In his affidavit as an expert witness for the Government, Dr. Tennant denied that there is any scientific literature relevant to the safety and effectiveness of the drugs in question, much less the required consensus of qualified experts that the drugs are safe and effective. Nothing to the contrary was put forward by Western Serum. Its products are therefore new drugs under the statute unless Western Serum can find shelter under the 1968 grandfather clause. Existence of the purely legal question of interpretation of the grandfather clause did not oust the district court of jurisdiction. We hold the district court did not err in hearing the case.
 
 
 10
 The court below, 498 F.Supp. 863 (D.Ariz.1980), held, under the authority of United States v. X-Otag Plus Tablets, 441 F.Supp. 105 (D.Colo.1977), aff'd, 602 F.2d 1387 (10th Cir. 1979), that the question for its decision was whether the FDA had "probable cause to believe that the drug in question was a new drug." 498 F.Supp. at 865-66. Only if "probable cause" exists, under this theory, should a district court take jurisdiction to consider enjoining the marketing of a drug when there has been no previous formal FDA finding that the drug is a "new drug." We do not approve or disapprove this standard. Consideration of the existence or scope of any "discretion" to defer to the FDA in enforcement actions under a primary jurisdiction theory can await a more appropriate case. The scientific or other specialized expertise which breathes life into the doctrine of primary jurisdiction, see Nader v. Allegheny Airlines, 426 U.S. 290, 303-07, 96 S.Ct. 1978, 1986-88, 48 L.Ed.2d 643 (1976), was simply not needed for resolution of this case by the district court.
 
 II.
 
 11
 Western Serum's main contention at oral argument was that the district court erred in not permitting it to prove that the drugs in question met the prerequisites of the 1968 grandfather clause. This grandfather clause, section 108(b)(3) of Pub.L. 90-399, 82 Stat. 342 (1968), states:
 
 
 12
 In the case of any drug (other than a drug subject to section 512(n) of the basic Act as amended by this Act) intended for use in animals other than man which, on October 9, 1962, (A) was commercially used or sold in the United States, (B) was not a new drug as defined by section 201(p) of the basic Act as then in force, and (C) was not covered by an effective application under section 505 of that Act, the words "effectiveness" and "effective" contained in section 201(w) as added by this Act to the basic Act shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day. (Emphasis added).
 
 
 13
 Western Serum interprets the statute to state that if a drug was generally recognized as safe in 1962, then it is forever exempt from the premarketing approval otherwise required by the Act as to both safety and effectiveness. We reject this contention, which is inconsistent both with the language of the grandfather clause and the purpose of the Food, Drug and Cosmetic Act to protect the public health. See United States v. An Article of Drug ... Bacto-Unidisk, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969).
 
 
 14
 Western Serum's assertion that 1962 is the only year in which recognition of safety need be proven relies on cases which discuss another grandfather clause of the Act, section 107(c)(4) of Pub.L. 87-781, 76 Stat. 780 (1962), reprinted at 21 U.S.C.A. § 321 note (1976).[3] Western Serum does not argue that this clause applies to its products but says that the 1968 grandfather clause at issue here should be interpreted in the same way as section 107(c)(4) of the 1962 grandfather clause. We accept the analogy, but not Western Serum's conclusion. None of the cases cited by Western Serum[4] focus on the issue of whether the cited section of the 1962 amendments "grandfathers" safety as well as effectiveness. Some cases do contain language which can be read as bolstering Western Serum's argument;[5] others support the Government's position by speaking of the grandfather clause as only affecting the Act's effectiveness provisions.[6] We are persuaded by the language and history of the clause that the 1968 (like the 1962) grandfather clause does not dispense with the need to prove current general recognition of safety before premarketing clearance is avoided.
 
 
 15
 The 1968 clause on its face withholds, for qualifying drugs, the application of only the effectiveness portions of the Act. If a drug was commercially used in 1962 and was generally recognized as safe by qualified experts (hence "not a new drug" under section 201(p) of the 1938 Act) and its manufacturer had not invoked the section 505 procedure necessary only for "new drugs," then the manufacturer could sell the drug without proving to the FDA that the drug was generally recognized as effective. If this plain meaning accurately states the legislative intent, the grandfather clause has no relevance to proof of safety, so that the Act's general principles continue to apply. Under those general principles, set out earlier in this opinion, since Western Serum's products are not generally recognized as safe by qualified experts, premarketing approval by the FDA is needed.
 
 
 16
 An analysis of the legislative purpose for the 1962 and 1968 grandfather clauses only reinforces the plain import of the congressional language.
 
 
 17
 Section 505 of the Food, Drug and Cosmetic Act of 1938, 52 Stat. 1052, already contained provisions requiring that "no person shall introduce or deliver for introduction into interstate commerce any new drug, unless an application filed pursuant to subsection b is effective with respect to such drug," and requiring the Secretary to deny the application if he found that the drug was unsafe. The 1962 amendments required for the first time that drugs be effective as well as safe, and required that both safety and effectiveness be policed by the FDA through premarketing approval. Whereas before, applications were automatically approved unless the FDA objected, the 1962 amendments required the FDA's affirmative approval of a drug as both safe and effective before it could be marketed. These major changes threatened administrative disruption. "Without transitional provisions all drugs-except those marketed prior to the 1938 Act whose labeling had not changed and which were exempt from the 'new drug' provision of § 201(p)-would have been in violation of the amended Act unless generally recognized as effective. Even (New Drug Applications) which were outstanding would have become ineffective because FDA had not approved them under the new criteria." USV Pharmaceutical Corp. v. Weinberger, 412 U.S. 655, 662, 93 S.Ct. 2498, 2504, 37 L.Ed.2d 244 (1973). To cope with this problem, a number of transitional provisions in section 107 of the 1962 amendments grandfathered drugs which were already subject to regulation under the 1938 version of the Act. The several transitional provisions are discussed in USV, 412 U.S. at 662-63, 93 S.Ct. at 2504. See also S.Rep.No. 1744, 87th Cong., 2d Sess. (1962), reprinted in (1962) U.S.Code Cong. & Ad.News 2884, 2891-93; Conf.Rep.No. 2526, 87th Cong., 2d Sess. (1962), reprinted in (1962) U.S.Code Cong. & Ad.News 2931-32. The analogue to the 1968 grandfather clause is found at section 107(c)(4). This clause was explained by Senator Eastland: "Established drugs which have never been required to go through new drug procedures will not be affected by the new effectiveness test insofar as their existing claims are concerned." 108 Cong.Rec. 17366 (1962).
 
 
 18
 The purpose of this clause was therefore to establish that drugs, generally recognized as safe in 1962 and thus not "new drugs" under section 201(p) of 1938 Act, would not automatically, solely by virtue of the 1962 amendments, become new drugs because they were not generally recognized as effective. Section 107(c)(4) had the limited purpose of easing the transition to a regime in which effectiveness as well as safety was a gatekeeper to the pharmaceutical market.
 
 
 19
 The 1968 grandfather clause was intended to have the same effect as section 107(c)(4) of the 1962 amendments, although slightly different wording was used. The 1938 Act already applied to drugs intended for use on animals other than man, and the 1962 amendments, including the transitional provisions, also were applicable to animal drugs. See R. Merrill & P. Hutt, Food and Drug Law 476 (1980). The purpose of the 1968 animal drug amendments was only to "coordinate and consolidate the applicable provisions governing drugs, feed, additives, and antibiotics into one logical coordinated system that, without removing any of the stringent requirements for premarketing clearance, would assist this clearance and the subsequent use of animal-health products.... The enactment of this legislation ... would in no way weaken the authorities of the Food and Drug Administration with respect to the regulation of new animal drugs." S.Rep.No. 1308, 90th Cong., 1st Sess. (1968), reprinted in (1968) U.S.Code Cong. & Ad.News 2607, 2608-09. Section 108(b)(3), the 1968 grandfather clause, thus did no more than restate section 107(c)(4) of the 1962 Act.
 
 
 20
 Assuming that none of Western Serum's products was a "new drug" in 1962, the effect of the 1968 grandfather clause was to assure Western Serum that it would never have to prove "general recognition of effectiveness" to avoid the premarketing clearance otherwise required by the Act as amended. There is nothing in either the language or purpose of the grandfather clause, however, that would insulate a drug from premarketing clearance for safety should it ever cease to be "generally recognized as safe," i.e., should a serious dispute arise concerning its safety. In interpreting the Food, Drug and Cosmetic Act, which is intended to protect the public health and safety, see United States v. An Article of Drug ... Bacto-Unidisk, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969), we should avoid any construction which would result in the free marketing of drugs which might well be unsafe.
 
 
 21
 Since Western Serum, after the issue was properly raised by the FDA in enforcement proceedings, failed to demonstrate that any of its eleven products at issue is generally regarded as safe at the present time, or has been grandfathered under the 1938 grandfather clause,[7] the district court properly enjoined Western Serum from distributing the eleven drugs in question without FDA clearance.
 
 
 22
 The judgment is AFFIRMED.
 
 
 
 *
 Honorable Robert C. Belloni, United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 A second injunction was issued against delivery or introduction into interstate commerce of any drug which was not manufactured in accordance with current good manufacturing practice, as required by 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Part 211 (1980). This injunction is not tested on this appeal
 
 
 [2]
 21 U.S.C. § 332 (1976): (a) The district courts of the United States and the United States courts of the Territories shall have jurisdiction, for cause shown, and subject to the provisions of section 381 (relating to notice to opposite party) of Title 28, to restrain violations of section 331 of this title, except paragraphs (h)-(j) of said section
 21 U.S.C. § 331 (1976): The following acts and the causing thereof are prohibited: (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.
 21 U.S.C. § 351 (1976): A drug or device shall be deemed to be adulterated-(a) (5) if it is a new animal drug which is unsafe within the meaning of section 360b of this title; ....
 21 U.S.C. § 321(w) (1976): The term "new animal drug" means any drug intended for use for animals other than man, including any drug intended for use in animal feed but not including such animal feed,-
 (1) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof; ....
 21 U.S.C. § 360b (1976): (a)(1) A new animal drug shall, with respect to any particular use or intended use of such drug, be deemed unsafe for the purposes of section 351(a)(5) and section 342(a)(2)(D) of this title unless-(A) there is in effect an approval of an application filed pursuant to subsection (b) of this section with respect to such use or intended use of such drug....
 (b) Any person may file with the Secretary an application with respect to any intended use or uses of a new animal drug. Such person shall submit to the Secretary as a part of the application (1) full reports of investigations which have been made to show whether or not such drug is safe and effective for use; ....
 
 
 [3]
 The relevant portion of the 1962 grandfather clause, § 107(c)(4) of Pub.L. 87-781: "In the case of any drug which, on the day immediately preceding the enactment date, (A) was commercially used or sold in the United States, (B) was not a new drug as defined by section 201(p) of the basic Act as then in force, and (C) was not covered by an effective application under section 505 of that Act, the amendments to section 201(p) (defining 'new drugs') made by this Act shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day."
 
 
 [4]
 United States v. Alcon Laboratories, 636 F.2d 876, 879 (1st Cir. 1981); United States v. An Article of Drug "Bentex Ulcerine," 469 F.2d 875, 878 (5th Cir. 1972); United States v. Articles of Drugs Labeled Colchinine, 442 F.Supp. 1236, 1242 (S.D.N.Y.1978)
 
 
 [5]
 For example, Alcon, in a discussion of statutory background, states that the grandfather clause "relieves (qualifying drugs) from premarketing approval." Id., 636 F.2d at 879. The issue of whether current recognition of safety is a separate prerequisite to obtaining relief from premarketing approval was not present in the Alcon case, and the court did not address it. There is nothing in the Alcon opinion inconsistent with our holding in this case
 
 
 [6]
 Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 614, 93 S.Ct. 2469, 2475, 37 L.Ed.2d 207 (1973); USV Pharmaceutical Corp. v. Weinberger, 412 U.S. 655, 658, 93 S.Ct. 2498, 2501, 37 L.Ed.2d 244 (1973); Smithkline Corp. v. Food and Drug Admin., 587 F.2d 1107, 1110 (D.C.Cir.1978); Rutherford v. United States, 542 F.2d 1137, 1141 (10th Cir. 1976)
 
 
 [7]
 Section 321(w), which defines "new animal drug," see note 1, also states that a drug not generally recognized as safe and effective "shall not be deemed to be a 'new animal drug' if at any time prior to June 25, 1938, it was subject to the Food and Drug Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use." Western Serum has not contended that it is entitled to the benefit of this more potent grandfather clause